Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| HANIBAL SOLIVAN Y OTROS

Apelados

v.

JUAN CARLOS SANTAELLA MARCHÁN EN SU CAPACIDAD OFICIAL COMO DIRECTOR EJECUTIVO DE LA COMISIÓN DE JUEGOS DEL GOBIERNO DE PUERTO RICO Y OTROS

Apelantes | TA2026AP00514 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan

Caso Núm.: SJ2026CV00644

Sobre: Mandamus |
|---|---|---|

Panel integrado por su presidente, el Juez Bonilla Ortiz, la Jueza Martínez Cordero y el Juez Robles Adorno.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 5 de junio de 2026.

Comparece Juan Carlos Santaella Marchán, en su capacidad oficial como director ejecutivo de la Comisión de Juegos del Gobierno de Puerto Rico, y Loraine Irizarry Torres, en su capacidad oficial como directora del Negociado de Máquinas de Juegos de Azar en Ruta (en adelante, parte apelante) mediante un recurso de apelación, para solicitarnos la revisión de la *Sentencia* emitida y notificada el 13 de mayo de 2026, por el Tribunal de Primera Instancia, Sala Superior de San Juan.[1]

Mediante la *Sentencia* apelada, el tribunal de instancia declaró *Ha Lugar* una Petición de *mandamus* presentada por la parte apelante del título, en cuanto a una de las causas de acción interpuestas, mientras que, en cuanto a la otra, dispuso era académica. Además, autorizó el desistimiento voluntario sin

---

[1] Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI), a la Entrada Núm. 26.

perjuicio en cuanto al Estado Libre Asociado de Puerto Rico (ELA), por lo que archivó la causa de acción contra esta parte.

En lo relativo a la expedición del auto de *mandamus*, emitió ciertas órdenes a la parte apelante, para que fuesen cumplidas en el término de cinco (5) días, contados a partir de la notificación de la *Sentencia* aquí apelada.

Por los fundamentos que expondremos, se *revoca* la *Sentencia* apelada.

I

El caso del título inició, el 28 de enero de 2026, cuando la parte apelada del título, compuesta por personas naturales y personas jurídicas, interpuso una *Petición de mandamus*.[2] En resumido, en su pliego, presentó dos (2) causas de acción. En la *primera* causa de acción, peticionó un *mandamus* para el acceso a la información pública al amparo de la Ley de Transparencia y Procedimiento Expedito para el Acceso a la Información Pública (Ley Núm. 141).[3] Solicitó, en síntesis, información pública sobre quince (15) categorías específicas relacionadas al proceso de licenciamiento bajo la Ley de Máquinas de Juegos de Azar (Ley Núm. 11).[4] De otro lado, en la *segunda* causa de acción, peticionó un *mandamus* para compeler el recibo, evaluación y notificación de incumplimientos, si alguno, de sus solicitudes de licencias de dueños mayoristas u operadores de máquinas de juegos de azar en ruta (solicitudes de licencia).

Puntualizamos que, en lo relativo a la *segunda* causa de acción, alegó que, tras intentar presentar solicitudes de licencia, la Comisión de Juegos del Gobierno de Puerto Rico (Comisión de Juegos) se había negado a recibirlas, sellarlas y asignarles número

---

[2] SUMAC TPI, a la Entrada Núm. 1.
[3] Ley Núm. 141-2019, 3 LPRA sec. 9912 *et seq.*
[4] Ley Núm. 11 de 22 de agosto de 1933, 15 LPRA sec. 82 *et seq.*

de expediente, así como a tramitarlas de acuerdo con la ley y reglamentación aplicable. Razonó que, conforme a la Sección 2.5 (G) del Reglamento para la Expedición, Manejo y Fiscalización de Licencias de Máquinas de Juegos de Azar en Ruta (Reglamento Núm. 9647),[5] quedaba establecido un deber ministerial claro e imperativo de determinar si una solicitud presentada estaba completa o incompleta. Abundó que, de concluir estaba incompleta, la Comisión de Juegos tenía un deber de notificar al solicitante los incumplimientos específicos dentro del término de quince (15) días. Añadió que, de acuerdo con la Ley Núm. 11,[6] también existía un deber ministerial de aceptar nuevas solicitudes de licencias hasta el máximo de veinticinco mil (25,000) máquinas, según autorizadas en la aludida ley. Por otro lado, alegaron que de acuerdo con el Informe de Examen OIG-E-24-006, emitido el 3 de noviembre de 2023, por la Oficina del Inspector General de Puerto Rico (OIG) se revelaron incumplimientos por parte de la Comisión de Juegos con las leyes y reglamentos aplicables al proceso de licenciamiento.

A tenor, rogó que se concedieran dos (2) solicitudes de remedio. En la *primera*,[7] solicitó acceso a cierta información pública al amparo de la Ley Núm. 141. Entonces, en la *segunda*, peticionó que se ordenara a la parte apelante, en virtud del auto de *mandamus*, a cumplir con su deber ministerial bajo la Sección 2.5 (G) del Reglamento Núm. 9647 y las Secciones 10 y 15 (a) de la Ley Núm. 11, específicamente:

(a) Aceptar y tramitar formalmente las solicitudes de licencias presentadas por cada uno de los peticionarios, emitiendo un recibo oficial que acredite la fecha de presentación y asigne un número de caso o expediente a cada solicitud;

---

[5] Reglamento Núm. 9647 de 22 de enero de 2025.
[6] 15 LPRA sec. 82 *et seq.*
[7] Por esta causa de acción haber resultado académica, cónsono a la *Sentencia* apelada y no formar parte del recurso, no incluiremos el detalle de lo solicitado, por no ser atinente al asunto ante nos.

(b) Evaluar cada solicitud presentada conforme dispone la normativa aplicable, incluyendo la Sección 2.5(G) del Reglamento Núm. 9467;

(c) Si la Comisión entiende que alguna solicitud está incompleta, notificar por escrito, dentro del término de quince (15) días, cuáles son los incumplimientos específicos identificados, con el detalle suficiente para que el solicitante pueda subsanar cualquier deficiencia;

(d) Si la Comisión determina que las solicitudes están completas, proceder a su evaluación y adjudicación conforme a los criterios establecidos en la Ley Núm. 11 y su reglamentación, dentro de los términos establecidos por ley; y

(e) Proveer un estimado razonable del tiempo que tomará la adjudicación final de cada solicitud.[8]

En reacción, el 3 de febrero de 2026, la parte apelante interpuso una *Oposición a petición de mandamus y solicitud de desestimación*.[9] En lo atinente, esbozó que el foro de instancia carecía de jurisdicción por falta de parte indispensable, tras no haber incluido como parte a la Comisión de Juegos, así como por no haber agotado remedios administrativos. Sobre la procedencia del auto de *mandamus*, acotó que no era procedente. Explicó que el auto de *mandamus* procedía, únicamente, para obligar al cumplimiento de un deber ministerial claro, específico e incondicional y no para ordenar actuaciones que requirieran un juicio regulatorio, discreción administrativa o evaluación técnica. Razonó que la Ley Núm. 11,[10] no imponía un deber ministerial en estos momentos, ya que contenía un lenguaje facultativo ("podrá"), y porque el periodo de transición para la aceptación de nuevas solicitudes no había concluido. Argumentó que el periodo dispuesto por la Sección 8 de la Ley 11,[11] disponía un periodo de transición de un (1) año para conectarse a los sistemas de interconexión, el cual había comenzado el 14 de enero de 2026, por lo que culminaría el próximo año a esa fecha. En esa misma línea, señaló que era después de ese periodo de transición y solo si no se habían otorgado licencias, equivalente

---

[8] SUMAC TPI, a la Entrada Núm. 1, pág. 31.
[9] *Íd.,* a la Entrada Núm. 6.
[10] 15 LPRA sec. 82 *et seq.*
[11] 15 LPRA sec. 84d.

a veinticinco mil (25,000) máquinas autorizadas, que la Comisión de Juegos podría aceptar nuevas solicitudes. Por otro lado, esbozó que la precitada Ley concedía, además, un plazo de dos (2) años, es decir, hasta el 14 de enero de 2028, para que los dueños mayoristas con licencias de máquinas activas pagaran el balance de licencia.

A tenor, sostuvo que actualmente no existía obligación legal alguna de aceptar nuevas solicitudes. Alegó que se habían expedido y mantenían ciento diez (110) licencias de dueño mayorista; que la Comisión de Juegos no se había negado a recibir solicitudes, y que algunos de los que componían la parte apelada fueron incluidos en una lista de espera en el año 2021, de la cual eventualmente fueron excluidos por no haber notificado oportunamente su interés. Esgrimió que, de concederse el remedio solicitado, se afectaría a los ciento diez (110) operadores que contaban con licencia y no eran parte del caso. Añadió que la parte apelada había incurrido en incuria por haber esperado más de cinco (5) años desde el inicio del proceso de licenciamiento antes de acudir al foro judicial. A tenor, peticionó la desestimación de la Petición de *mandamus*, con perjuicio, por dejar de exponer una reclamación que justificara la concesión de un remedio.

En el interín, el 5 de febrero de 2026, el ELA presentó una *Moción de desestimación*.[12] En síntesis, planteó que de las alegaciones presentadas no se sostenía la inclusión del ELA como parte, puesto a que no se había presentado alegación alguna que justificara la concesión de un remedio por esta a la parte apelada.

En reacción, el 4 de marzo de 2026, la parte apelada interpuso una *Réplica a "oposición a petición de mandamus y solicitud de desestimación" (ENT. #6) y a "moción de desestimación" (ENT. #8)*.[13] Luego de presentar sus argumentos, solicitó (i) se denegara la

---

[12] SUMAC TPI, a la Entrada Núm. 8.
[13] *Íd.*, a la Entrada Núm. 12.

solicitud de desestimación y procediera a la adjudicación del *mandamus* en sus méritos; (ii) se declarara cuál era el estado de derecho imperante respecto al trámite de solicitudes bajo el Reglamento Núm. 9647,[14] incluyendo el alcance de las obligaciones ministeriales que recaían sobre la parte apelada conforme a la Sección 10 de la Ley Núm. 11,[15] y la Sección 2.5 (G) del precitado reglamento;[16] (iii) se expidiera el auto de *mandamus* y se ordenara a la parte apelante a recibir, tramitar y evaluar las solicitudes de licencia de la parte apelada conforme al procedimiento establecido en el Reglamento Núm. 9647;[17] (iv) se ordenara a la parte apelante a entregar la información y documentos requeridos en el requerimiento de información; (v) se dispusiera que, en caso de que el foro de instancia entendiera que la Comisión de Juegos era parte indispensable, se concediera autorización para enmendar la petición a esos fines; (vi) se archivara la *Petición de mandamus* en cuanto al ELA, y (vii) se emitiera cualquier otro pronunciamiento que procediera en derecho.

Por otro lado, el 5 de marzo de 2026, la parte apelada presentó una *Solicitud de vista argumentativa.*[18] Esbozó que, a los fines de asistir al Tribunal y aclarar cualquier extremo relacionado a las cuestiones planteadas en la *Petición de mandamus,* así como a las dos (2) mociones dispositivas y su réplica, solicitaba que se señalara una vista argumentativa.

A esos fines, mediante *Orden* emitida y notificada el 6 de marzo de 2026, el foro *a quo* señaló vista para discutir todos los asuntos pendientes.[19] Posteriormente, mediante *Orden* emitida y

---

[14] S*upra.*
[15] 15 LPRA sec. 84f.
[16] *Supra.*
[17] *Íd.*
[18] SUMAC TPI, a la Entrada Núm. 13.
[19] *Íd.,* a la Entrada Núm. 14.

notificada el 9 de marzo de 2026, a solicitud de la parte apelante, el tribunal reseñaló la vista para el 26 de marzo de 2026.[20]

Así las cosas, el 26 de marzo de 2026, se celebró la vista programada. A la misma comparecieron algunos integrantes de la parte apelada, pero todos representados por sus abogados. Por otro lado, compareció la parte apelante por conducto de sus representantes legales, al igual que el ELA. Se desprende de la *Minuta* de la vista que el ELA fue excusado de la vista y que las partes tuvieron la oportunidad de argumentar de forma amplia sobre sus respectivas posiciones en cuanto a los escritos presentados.[21] Así, el asunto quedó sometido.

De ahí, y previo a que el foro de instancia se pronunciara por escrito en torno al resultado de la vista celebrada el 11 de mayo de 2026, la parte apelada incoó una *Moción informativa*.[22] Informó que, luego de haberse llevado a cabo una inspección de documentos, cónsono a lo ordenado por el foro de instancia, daba por concluido este asunto y, por ende, la *primera* causa de acción de la *Petición de mandamus*.

Finalmente, y producto de la vista celebrada, el 13 de mayo de 2026, el foro de instancia emitió y notificó la *Sentencia* objeto de esta apelación.[23] Mediante su dictamen, declaró *Ha Lugar* y expidió el auto de *mandamus* en cuanto a la *segunda* causa de acción, relativa al procesamiento de las solicitudes de licencias. En consecuencia, ordenó a la parte apelada a cumplir con el deber ministerial bajo la Sección 2.5 (G) del Reglamento Núm. 9647,[24] y la Sección 10 de la Ley Núm. 11,[25] dentro del término de cinco (5) días, contados desde la notificación de la *Sentencia*, de la siguiente forma:

---

[20] SUMAC TPI, a la Entrada Núm. 18.
[21] *Íd.*, a la Entrada Núm. 21.
[22] *Íd.*, a la Entrada Núm. 24.
[23] *Íd.*, a la Entrada Núm. 26.
[24] *Supra.*
[25] 15 LPRA sec. 84f.

(a) Recibir, aceptar y tramitar formalmente las Solicitudes de Licencias para Dueños Mayoristas u Operadores de Máquinas de Azar en Ruta presentadas por los Peticionarios, emitiendo un recibo oficial que acredite la fecha de presentación y asignando un número de caso o expediente a cada solicitud, disponiéndose que dichas solicitudes serán tramitadas y procesadas con prioridad y carácter preferente sobre cualquier otra solicitud presentada por terceros y/o con posterioridad a la fecha de notificación de esta Sentencia;

(b) Evaluar cada solicitud conforme a las disposiciones de la Ley Núm. 11, *supra*, y del Reglamento Núm. 9647, incluyendo, sin que se entienda como una limitación, la Sección 2.5 (G) de dicho Reglamento;

(c) De determinarse que alguna solicitud está incompleta, notificar por escrito al Peticionario correspondiente, dentro del término reglamentario de quince (15) días dispuesto en la Sección 2.5 (G) del Reglamento Núm. 9647, cuáles son los incumplimientos específicos identificados, con el detalle suficiente para que el solicitante pueda subsanar las deficiencias;

(d) De determinarse que alguna solicitud está completa, proceder a su evaluación y adjudicación conforme a los criterios de la Ley Núm. 11, *supra*, y su reglamentación, dentro de los términos establecidos por ley.[26]

Por otro lado, declaró *No Ha Lugar* la *Oposición a petición de mandamus y solicitud de desestimación* presentada por la parte apelante. Además, dispuso que la *primera* causa de acción en la *Petición de mandamus* relativa al acceso a la información pública, conforme a la Ley Núm. 141,[27] era académica. De igual forma, ordenó el desistimiento voluntario y archivo de la *Petición de mandamus* en cuanto al ELA.

Por último, apercibió a la parte apelante que el incumplimiento con lo ordenado podría conllevar la imposición de desacato civil y/o criminal.

Como parte del dictamen objeto de revisión, el foro *a quo* emitió las siguientes determinaciones de hechos:

1. Los Peticionarios son veinte (20) personas naturales y diez (10) personas jurídicas organizadas al amparo de las leyes del Estado Libre Asociado de Puerto Rico, todas comerciantes interesadas en participar en la industria de máquinas de juegos de azar en ruta en Puerto Rico, conforme a la Ley Núm. 11 de 22 de agosto de 1933, según enmendada, conocida como *la Ley de Máquinas de*

---

[26] SUMAC TPI, a la Entrada Núm. 26, pág. 42.
[27] 3 LPRA sec. 9912 *et seq.*

*Juegos de Azar*, 15 LPRA sec 82 *et seq.* (en adelante, "Ley Núm. 11").

2. El Peticionado Juan Carlos Santaella Marchán es el Director Ejecutivo de la Comisión de Juegos del Gobierno de Puerto Rico, agencia gubernamental creada al amparo de la Ley Núm. 81-2019, según enmendada, conocida como la *Ley de la Comisión de Juegos del Gobierno de Puerto Rico*, 15 LPRA sec. 981 *et seq.*

3. La Peticionada Loraine Irizarry Torres es la Directora del Negociado de Máquinas de Juegos de Azar en Ruta, negociado adscrito a la Comisión de Juegos.

4. La Comisión de Juegos tiene jurisdicción sobre los asuntos relacionados con la Ley Núm. 11, *supra*, incluyendo la facultad de expedir, denegar, revocar, suspender y restringir las licencias de máquinas de juegos de azar en ruta, así como la obligación de hacer cumplir las disposiciones de dicha Ley.

5. La Sección 6 de la Ley Núm. 11, 15 LPRA sec. 84b, autoriza un máximo de 25,000 Máquinas de Juegos de Azar en ruta en Puerto Rico.

6. La Sección 10 de la Ley Núm. 11, 15 LPRA sec. 84f, dispone que la Comisión "deberá dar prioridad durante los primeros tres (3) meses a partir de la aprobación del Reglamento" a aquellas personas naturales o jurídicas que tuviesen vigentes licencias de máquinas de entretenimiento de adultos previo a la aprobación de la Ley Núm. 77-2014.

7. La Sección 10 de la Ley Núm. 11, *supra*, dispone, además, que "[s]i luego de transcurrido el periodo de transición para otorgar licencias a solicitantes con prioridad, la Comisión aún no ha expedido la cantidad de licencias equivalentes a las veinticinco mil (25,000) máquinas de juegos de azar autorizadas mediante la presente Ley, entonces la Comisión podrá aceptar nuevas solicitudes de licencia de Dueño Mayorista hasta alcanzar el número máximo autorizado en esta Ley".

8. El 22 de enero de 2025, la Comisión de Juegos aprobó el Reglamento Núm. 9647, titulado *Reglamento para la Expedición, Manejo y Fiscalización de Licencias de Máquinas de Juegos de Azar en Ruta* (en adelante, "Reglamento Núm. 9647").

9. La Sección 2.5(G) del Reglamento Núm. 9647 dispone que "[l]a Comisión de Juegos solamente evaluará aquella Solicitud de Licencia completa y acompañada por toda la información requerida en este Reglamento, disponiéndose, que toda Solicitud incompleta que sea presentada a la Comisión de Juegos se entenderá como si no hubiera sido presentada. La Comisión, dentro de un término de quince (15) días a partir de concluir que la solicitud entregada está incompleta, le notificará al solicitante cuáles son los incumplimientos específicos...".

10. El periodo de tres (3) meses de prioridad establecido en la Sección 10 de la Ley Núm. 11, *supra*, comenzó con la aprobación del Reglamento Núm. 9647 el 22 de enero de 2025 y venció en o alrededor del 22 de abril de 2025.

11. El 9 de octubre de 2020, la Comisión de Juegos publicó un aviso notificando que, a partir del 15 de octubre de 2020, las personas o entidades interesadas en ser autorizadas como Dueños Mayoristas u Operadores de Máquinas de Juegos de Azar en Ruta podían presentar sus solicitudes de licencia para evaluación por el Negociado de Juegos de Azar de la Comisión.

12. Del proceso de licenciamiento iniciado en el año 2020, la Comisión de Juegos expidió ciento diez (110) licencias de Dueño Mayorista u Operador, las cuales se mantienen vigentes al día de hoy.

13. El 26 de agosto de 2022, la Comisión de Juegos emitió la *Orden Administrativa OACJ-MR-22-01*, mediante la cual dispuso, en su acápite octavo, la publicación de un listado de los aspirantes que cumplimentaron debidamente su solicitud durante el proceso de licenciamiento 2021-2022 y no obtuvieron licencia, otorgándoles un término de treinta (30) días, desde la publicación del listado, para notificar a la Comisión su interés en obtener una licencia de Dueño Mayorista u Operador.

14. Los Peticionarios B & W Amusements, Corp., DH Enterprises Corp., José Antonio Chevres Ríos y Gilberto Narváez Rodríguez (GN Games) figuraron en la Lista de Espera publicada conforme a la *Orden Administrativa OACJ-MR22-01*.

15. El 21 de junio de 2024, la Comisión de Juegos emitió la *Orden Administrativa OACJ-MR-24-11*, mediante la cual aprobó el Estándar Técnico y el Estándar de Interconexión para Máquinas de Juegos de Azar en Ruta.

16. El 11 de diciembre de 2025, la Comisión de Juegos emitió la *Orden Administrativa OACJ-MR-25-02* mediante la cual dispuso iniciar el periodo de interconexión a los sistemas certificados conforme a la Sección 8 de la Ley Núm. 11, supra, el 14 de enero de 2026. Dicho periodo de interconexión es distinto e independiente del periodo de tres (3) meses de prioridad establecido en la Sección 10 de la Ley Núm. 11, supra, referido en las determinaciones que anteceden.

17. A la fecha de la presentación de la *Petición de Mandamus*, la Comisión de Juegos había expedido y mantenía vigentes 110 licencias de Dueño Mayorista u Operador de Máquinas de Juegos de Azar en Ruta.

18. Conforme a la representación oficial de la propia Comisión de Juegos, las 110 licencias vigentes cubren sobre 23,000 máquinas de juegos de azar autorizadas, cifra inferior al máximo de 25,000 máquinas autorizadas por la Sección 6 de la Ley Núm. 11, *supra*.

19. A la fecha de esta *Sentencia*, existe un remanente de aproximadamente dos mil (2,000) máquinas disponibles dentro del tope estatutario fijado por la Sección 6 de la Ley Núm. 11, *supra*.

20. Durante el periodo comprendido entre los años 2021 y 2025, los Peticionarios realizaron múltiples gestiones para presentar ante la Comisión de Juegos sus solicitudes de licencia como Dueños Mayoristas de Máquinas y/o Dueños de Negocios conforme a la Ley Núm. 11, *supra*, y al Reglamento Núm. 9647, *supra*, incluyendo

comparecencias personales a las oficinas de la Comisión de Juegos y entregas de la documentación requerida.

21. La Comisión de Juegos no recibió formalmente, selló, emitió recibo oficial alguno ni asignó número de caso o expediente a las solicitudes presentadas por los Peticionarios.

22. La Comisión de Juegos no notificó a los Peticionarios determinación alguna respecto a si sus solicitudes estaban completas o incompletas y, en consecuencia, no notificó incumplimientos específicos conforme al término de quince (15) días dispuesto en la Sección 2.5(G) del Reglamento Núm. 9647.

23. El 29 de septiembre de 2025, los Peticionarios Elsa Soto Bonilla y Francisco Tirado Ruiz acudieron personalmente a las oficinas de la Comisión de Juegos con el propósito de presentar sus solicitudes de licencia y esperaron por más de cuatro (4) horas sin ser atendidos por funcionario alguno, según consta de la Declaración Jurada acompañada a la Réplica presentada por los Peticionarios.

24. El 17 de noviembre de 2025, la representación legal de los Peticionarios cursó a los Peticionados Santaella Marchán e Irizarry Torres una comunicación titulada *Solicitud de Información Pública y Requerimiento Previo sobre Procesamiento de Solicitudes de Licencias*, remitida tanto por correo electrónico como mediante entrega personal.

25. Dicha comunicación constituyó un requerimiento previo formal con dos propósitos: (i) solicitar formalmente información pública sobre quince (15) categorías específicas relacionadas con el proceso de licenciamiento bajo la Ley Núm. 11, *supra*; y (ii) requerir formalmente a la Comisión de Juegos que aceptara y procesara las solicitudes de licencias de los Peticionarios.

26. En el requerimiento previo, los Peticionarios exigieron expresamente a la Comisión de Juegos que, dentro del término de diez (10) días laborables: (a) aceptara y tramitara formalmente las solicitudes de licencias presentadas por cada Peticionario, emitiendo recibo oficial que acredite la fecha de presentación y asignando un número de caso o expediente a cada solicitud; (b) evaluara cada solicitud presentada; (c) en caso de entender que alguna solicitud estaba incompleta, notificara por escrito los incumplimientos específicos identificados; (d) si determinara que las solicitudes estaban completas, procediera a su evaluación y adjudicación conforme a los criterios de la Ley Núm. 11 y su reglamentación; y (e) proveyera un estimado razonable del tiempo que tomaría la adjudicación final de cada solicitud.

27. La Peticionada Irizarry Torres recibió personalmente la comunicación del 17 de noviembre de 2025, según consta del acuse de recibo correspondiente.

28. El 5 de diciembre de 2025, el Administrador de Documentos Públicos de la Comisión de Juegos, Sr. Michael H. Jiménez Vélez, solicitó por correo electrónico a la representación legal de los Peticionarios una prórroga para contestar el requerimiento previo, fijando como nueva fecha límite el 19 de diciembre de 2025.

29. La Comisión de Juegos no contestó el requerimiento previo dentro de la prórroga que ella misma solicitó.

30. El 14 de enero de 2026, la representación legal de los Peticionarios se comunicó nuevamente con el Sr. Michael H. Jiménez Vélez en seguimiento al requerimiento previo, y este confirmó que la última comunicación remitida por la Comisión de Juegos había sido la solicitud de prórroga del 5 de diciembre de 2025.

31. Entre la fecha de la solicitud de prórroga y la presentación de la *Petición de Mandamus* el 28 de enero de 2026, la Comisión de Juegos no aceptó, recibió formalmente, tramitó, evaluó ni adjudicó las solicitudes de licencia de los Peticionarios, ni notificó incumplimiento específico alguno conforme a la Sección 2.5(G) del Reglamento Núm. 9647.

32. El 3 de noviembre de 2023, la Oficina del Inspector General de Puerto Rico emitió el *Informe de Examen OIG-E-24-006* sobre los procesos de solicitud, otorgación, denegación y revocación de licencias para Dueños Mayoristas u Operadores y Dueños de Negocios de Máquinas de Juegos de Azar en Ruta de la Comisión de Juegos.

33. El *Informe de Examen OIG-E-24-006* concluyó que "la Comisión incumplió con leyes y reglamentos aplicables a los procesos de solicitud, otorgación, denegación y revocación de licencias".

34. El *Informe de Examen OIG-E-24-006* documentó, entre otros, los siguientes hallazgos: (a) que en el 15% de los expedientes examinados faltaba la notificación al dueño mayorista sobre si su solicitud estaba completa o incompleta; (b) que en el 38% de los expedientes examinados faltaban documentos requeridos por la reglamentación aplicable; (c) que la Comisión limitó inicialmente a 110 los operadores certificados aunque recibió 195 solicitudes, dejando 19 solicitudes completas en lista de espera sin procesar, 38 solicitudes pendientes de evaluar y 22 solicitudes incompletas en lista de espera; y (d) que se otorgaron licencias de Dueños de Negocios sin la presentación de la solicitud ni la documentación requerida para realizar la investigación previa.

38. Al día de hoy, la Comisión de Juegos no ha aceptado formalmente, sellado, asignado número de expediente, tramitado, evaluado, adjudicado ni notificado incumplimientos específicos respecto a las solicitudes de licencia de los Peticionarios.[28]

En el dictamen apelado el tribunal *a quo,* tras evaluar los múltiples planteamientos esgrimidos por las partes, llegó a varias conclusiones las cuales sintetizamos de la siguiente forma: (i) en cuanto a la *primera* causa de acción, concluyó que dicha

---

[28] SUMAC TPI, a la Entrada Núm. 26, págs. 7-12. Nótese que, aun cuando se enumeraron treinta y ocho (38) determinaciones de hecho, lo cierto es que fueron treinta y cinco (35). Fueron enumeradas del uno (1) al treinta y cuatro (34) y luego el número treinta y ocho (38).

controversia estaba resuelta pues la parte apelada entregó la información solicitada, tornándose el asunto académico; (ii) razonó que la *Petición de mandamus* no incluía alegaciones contra el ELA, por lo que no se justificaba la concesión de un remedio y procedía el desistimiento sin perjuicio y archivo; (iii) concluyó que la Comisión de Juegos no era parte indispensable, pues el auto de *mandamus* se dirigía contra los funcionarios del deber ministerial y una orden contra ellos en sus capacidades oficiales era suficiente para el cumplimiento, sin necesidad de incluirla como parte separada, más aún cuando la controversia no envolvía la impugnación de licencias ni la redistribución de máquinas autorizadas; (iv) dispuso que no aplicaba la doctrina de agotamiento de remedios administrativos, ya que la parte apelada no tuvo acceso a ningún procedimiento que agotar y, aún si existiera, concurrían excepciones válidas para preterir el cauce administrativo; y (v) concluyó que no procedía la defensa de incuria puesto a que el reclamo era presente y continuo bajo el Reglamento Núm. 9647[29] y, además, la parte apelante no demostró perjuicio alguno por la presentación del *mandamus.*

Por otro lado, en cuanto a la s*egunda* causa de acción, dispuso que procedía emitir el auto de *mandamus* para compeler a la Comisión de Juegos a recibir, tramitar y adjudicar solicitudes de licencias conforme a la Ley Núm. 11,[30] y el Reglamento Núm. 9647,[31] determinado que, el término de dos (2) años de la Sección 10 de la Ley Núm. 11,[32] no impedía aceptar nuevas solicitudes ni suspendía el deber ministerial mientras existieran máquinas disponibles. Por tanto, reconoció un deber claro e incondicional de aceptar las solicitudes y notificar deficiencias dentro de quince (15) días, siendo

---

[29] S*upra.*
[30] 15 LPRA sec. 82 *et seq.*
[31] S*upra.*
[32] 15 LPRA sec. 84f.

el *mandamus* el mecanismo adecuado para asegurar su cumplimiento.

En desacuerdo, el 18 de mayo de 2026, la parte apelante presentó un recurso de *apelación* en el cual esbozó los siguientes cuatro (4) señalamientos de error:

PRIMER ERROR:

Erró el Tribunal de Primera Instancia al expedir un auto de mandamus sin que existiera un deber ministerial claro, específico e incondicional de recibir, aceptar, tramitar, evaluar, notificar deficiencias y adjudicar solicitudes nuevas de licencias de Dueño Mayorista u Operador de Máquinas de Juegos de Azar en Ruta; al convertir la frase "podrá aceptar nuevas solicitudes" de la Sección 10 de la Ley Núm. 11 en una obligación ministerial inmediata; al ignorar el derecho de los Dueños Mayoristas con licencias activas a completar el balance de máquinas que corresponda a sus respectivas licencias dentro del término de dos años, sujeto al máximo individual de 250 máquinas y al máximo estatutario global de 25,000 máquinas; y al adjudicar, bajo la etiqueta de mandamus, una sentencia declaratoria de facto sobre el alcance de la Sección 10 de la Ley Núm. 11, la Sección 2.5(G) del Reglamento Núm. 9647, la disponibilidad del remanente de máquinas y la administración del cupo estatutario.

SEGUNDO ERROR:

Erró el Tribunal de Primera Instancia y abusó de su discreción al hacer determinaciones de hechos extensas y materiales sin celebrar una vista evidenciaria, sin recibir prueba testifical, sin admitir exhibits en evidencia y sin contar con estipulaciones de hechos entre las partes; y al convertir alegaciones, argumentos de abogados y anejos a mociones en determinaciones de hechos adjudicadas sobre las alegadas gestiones de los peticionarios, la supuesta negativa de la Comisión a recibir solicitudes, el historial administrativo individual de los peticionarios, la lista de espera, el agotamiento de remedios administrativos, la existencia de un remanente supuestamente disponible y la alegada ausencia de perjuicio a los 110 Dueños Mayoristas licenciados.

TERCER ERROR:

Erró el Tribunal de Primera Instancia al rechazar la defensa de falta de partes indispensables y conceder un remedio que afecta el cupo estatutario limitado de 25,000 máquinas, el remanente sujeto al derecho de los 110 Dueños Mayoristas u Operadores licenciados y el término de dos años reconocido por la Sección 10 de la Ley Núm. 11, sin la comparecencia de dichos Dueños Mayoristas u Operadores licenciados; y al concluir que esos terceros no se veían afectados porque la Sentencia no revocaba expresamente sus licencias, ignorando que la afectación surge de una orden judicial que trata como disponible un remanente sujeto a derechos vigentes, obliga a tramitar solicitudes nuevas sobre el mismo universo regulatorio y concede prioridad preferente a los peticionarios sin escuchar a los titulares de esos derechos.

CUARTO ERROR:

Erró el Tribunal de Primera Instancia al conceder un remedio ultra vires y no contemplado por la Ley Núm. 11 ni por el Reglamento Núm. 9647, al crear una prioridad y carácter preferente a favor de los peticionarios sobre cualquier otra solicitud presentada por terceros o con posterioridad a la notificación de la Sentencia; y al alterar judicialmente el orden estatutario y reglamentario de administración del cupo limitado de máquinas de juegos de azar en ruta, desplazando el derecho de los Dueños Mayoristas licenciados sobre el remanente durante el término aplicable y concediendo a los peticionarios una ventaja procesal y sustantiva que no surge de ley, reglamento ni del remedio extraordinario de mandamus.

En igual fecha, la parte apelante incoó una *Moción en auxilio de jurisdicción.*

Mediante *Resolución* emitida el 19 de mayo de 2026, en lo pertinente, declaramos *Ha Lugar* la solicitud de paralización de los procedimientos ante el foro de instancia hasta que otra cosa se dispusiera y concedimos a la parte apelada hasta el 2 de junio de 2026, para expresarse en torno al recurso.

El 2 de junio de 2026, compareció la parte apelada mediante *Alegato en oposición.* Peticionó que se confirmara el dictamen apelado. El argumento principal de la parte apelada fue, en síntesis, que debía confirmarse la expedición del auto de *mandamus* puesto a que surgía claramente del Reglamento 9647,[33] que existía un deber ministerial no discrecional de recibir, aceptar, tramitar y evaluar solicitudes de licencias y que, de estar incompletas, se notificaran las mismas dentro del término reglamentario. Sostuvo que la Comisión de Juegos había cumplido con ese deber ministerial y que, a tenor, el foro de instancia emitió el dictamen objeto de apelación.

En igual fecha, la parte apelada presentó una solicitud para excederse del número de páginas reglamentarias en su escrito en oposición, así como una petición para que se desglosaran ciertos expedientes de los autos arguyendo que los mismos no obraban en

---

[33] *Supra.*

los autos ante el foro primario. Mediante *Resolución* emitida el 3 de junio de 2026, quedamos enterados de la presentación del escrito y autorizamos la radicación en exceso del máximo reglamentario. Por otro lado, dispusimos que, de no obrar los documentos señalados en los autos ante el tribunal de instancia, los mismos no serían considerados al momento de disponer de este recurso. Habiendo quedado perfeccionado el recurso de autos, procederemos a disponer del mismo con el beneficio de la comparecencia de ambas partes

II

### A. El *Mandamus*

El Código de Enjuiciamiento Civil de Puerto Rico define el recurso de *mandamus* como uno altamente privilegiado, dictado a nombre del Gobierno de Puerto Rico por un tribunal con competencia, y dirigido a alguna persona natural, a una corporación o a un tribunal judicial de inferior categoría dentro de su jurisdicción, requiriéndoles para el cumplimiento de algún acto que en el referido auto se exprese y que esté dentro de sus atribuciones o deberes.[34] Así, pues, el auto de *mandamus* no confiere nueva autoridad, por lo que la parte a quien obliga deberá tener la facultad de poder cumplirlo.[35]

De igual modo, el referido recurso sólo procede para exigir el cumplimiento de un deber impuesto por la ley. Es decir, un deber calificado de "ministerial" y que, como tal, no admita discreción en su ejercicio, sino que sea mandatorio e imperativo.[36] Entiéndase que, "no se trata de una directriz o una disposición que permite hacer algo, sino de un mandato específico que la parte demandada

---

[34] Artículo 649 del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA sec. 3421.
[35] *Íd.*
[36] *Kilómetro 0 v. Pesquera López et al.,* 207 DPR 200, 214 (2021); *AMPR v. Srio. Educación, ELA,* 178 DPR 253, 263 (2010).

no tiene opción para desobedecer".[37] Ahora bien, si el acto en cuestión depende de la discreción o juicio de un funcionario, tal deber se considera como no ministerial.[38] Conviene mencionar que, puesto a que el deber ministerial que exige el *mandamus* debe emanar de un empleo, cargo o función pública, el recurso puede proceder contra todos los funcionarios del poder ejecutivo.[39]

De otra, precisa acentuar que para que se logre expedir un auto de *mandamus,* es necesario que exista la constancia de un deber claramente definido que deba ser ejecutado.[40] Además, por tratarse de un recurso altamente privilegiado, su expedición no se invoca como cuestión de derecho, sino que descansa en la sana discreción del tribunal.[41] Sin embargo, la procedencia del *mandamus* depende inexorablemente del carácter del acto que se pretende compeler mediante dicho recurso.[42] En tal sentido, este recurso extraordinario "sólo procede para ordenar el cumplimiento de un deber ministerial, que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir ese remedio".[43] Asimismo, la jurisprudencia ha discutido que para que proceda un recurso de *mandamus* es necesario que la parte peticionaria demuestre que hizo un requerimiento a la parte demandada para que cumpliera con el deber que se le exige, y que el mismo no fue debidamente atendido.[44] Ahora bien, se eximirá de cumplir con el requerimiento cuando:

> 1) aparece que [el mismo] hubiese sido inútil e infructuoso, pues hubiese sido denegado si se hubiera hecho; o

---

[37] *Carrasquillo Román v. Inst. Correccional,* 204 DPR 699, 713 (2020).
[38] *Romero Lugo, v. Cruz Soto,* 205 DPR 972, 985 (2020).
[39] *Noriega v. Hernández Colón,* 135 DPR 406, 448 (1994).
[40] *AMPR v. Srio. Educación, ELA,* supra, a las págs. 263-264.
[41] *Íd.,* a la pág. 266.
[42] *Acevedo Vilá v. Aponte Hernández,* 168 DPR 443, 455 (2006).
[43] *Aponte Rosario et al. v. Pres. CEE II,* 205 DPR 407, 427-428 (2020)*; Acevedo Vilá v. Aponte Hernández,* supra, a las págs. 454-455.
[44] *Romero Lugo, v. Cruz Soto,* supra*,* a la pág. 985; *Noriega v. Hernández Colon,* 135 DPR 406, 448-449 (1994).

2) el deber que se pretende exigir es uno de carácter público; a diferencia de uno de naturaleza particular que afecta solamente el derecho del peticionario".[45]

Igualmente, se excusará de cumplir con el antedicho requerimiento cuando se presente un auto de *mandamus* ante la inobservancia de una agencia administrativa con los términos dispuestos por las Secciones 3.13 (g) y 13.14 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAUG).[46] Ello, puesto que Tribunal de Apelaciones debe resolver este recurso rápidamente y con carácter prioritario.[47]

### B. La Ley de Juegos de Azar de 1933

A través de la Ley de Máquinas de Juegos de Azar de 1933 (Ley Núm. 11),[48] entre otras cosas "[s]e autoriz[ó] la introducción, distribución, adquisición, venta, arrendamiento, transportación, ubicación, colocación, funcionamiento, mantenimiento, operación, uso, custodia y posesión de las máquinas de entretenimiento de adultos en negocios o establecimientos que operen en la jurisdicción del Gobierno de Puerto Rico".[49] Este cuerpo normativo define las Máquinas de Juego de Azar como aquellas que "usan un elemento de azar en la determinación de premios, contienen alguna forma de activación para iniciar el proceso de la apuesta, y hacen uso de una metodología adecuada para la entrega de resultados determinados".[50] Precisa reseñar que mediante la Ley Núm. 81-2019, se estableció la Comisión de Juegos de Puerto Rico (Comisión de Juegos) y se le delegó jurisdicción sobre todos los asuntos dispuestos en la Ley Núm. 11.[51]

---

[45] *AMPR v. Srio. Educación, ELA*, supra, a la pág. 296; *Noriega v. Hernández Colon*, supra, a las págs. 448-449.

[46] Ley Núm. 38 de 30 de junio de 2017, 3 LPRA secs. 9653 y 9654.

[47] *J. Exam. Tec. Méd. v. Elías*, et al., 144 DPR 483, 495-496 (1997).

[48] Ley Núm. 11, *supra*, 15 LPRA sec. 82 *et seq.*

[49] *Íd.,* Sección 4, 15 LPRA sec. 83.

[50] *Íd.*, Sección 3 (18), 15 LPRA sec. 82.

[51] Artículo 2.2 de la Ley de la Comisión de Juegos del Gobierno de Puerto Rico, Ley Núm. 81-2019, 15 LPRA sec. 982.

Durante el periodo en el cual ha estado vigente la Ley Núm. 11, esta ha sufrido un sinnúmero de enmiendas. En lo pertinente al caso de marras, puntualizamos que, mediante la Ley Núm. 257-2018, se añadieron a la aludida ley, entre otras, las Secciones 8 y 10.[52] La Sección 8 se añadió a los fines de establecer una prohibición general, la cual leía como sigue:

> "Ninguna Persona operará Máquinas de Juegos de Azar en Puerto Rico sin una Licencia y Marbete debidamente emitida por la Compañía y sin estar conectada al Sistema Central de Computadoras, conforme a las disposiciones de la presente Ley".[53]

Mientras que la Sección 10 se añadió a los fines imponer un deber de promulgar, a los sesenta (60) días de haber aprobado la Ley, un reglamento el cual estableciera los procedimientos para la otorgación de licencias.[54] De otra parte, se dispuso en esta Sección que, aprobado el reglamento, se concedería prioridad durante un periodo tres (3) meses a las empresas o individuos que tuviesen vigentes licencias de máquinas de entretenimiento de adultos previo a la aprobación de la Ley Núm. 77-2014.[55] Así, pues, "si luego de transcurrido el periodo inicial de otorgar licencias, la Compañía aún no ha expedido la cantidad de licencias equivalentes a las veinticinco mil (25,000) máquinas de juegos de azar autorizadas mediante la presente Ley, entonces la Compañía podrá aceptar nuevas solicitudes de licencia hasta alcanzar el número máximo autorizado en esta Ley".[56]

Posteriormente, la referidas dos (2) secciones fueron enmendadas por la Ley Núm. 104-2022. Uno de los propósitos de esta Ley era establecer un periodo de Transición para la conexión al Sistema de Conexión Interna. El referido sistema se introdujo como "un requisito indispensable para la operación de la máquinas, [el

---

[52] Secciones 8 y 11 de la Ley Núm. 11, *supra*, 815 LPRA secs. 84d y 84f.
[53] Artículo 137 de la Ley Núm. 257-2018, 815 LPRA sec. 84d.
[54] *Íd.*, Artículo 139, 815 LPRA sec. 84f.
[55] *Íd.*
[56] *Íd.*

cual mantendría] los datos de identificación de cada equipo, plataforma, juegos, sus versiones, el registro de seguridad de conexión, los premios pagados y el registro de los ingresos generados por la actividad de las máquinas".[57] El referido sistema es de libre selección por cada dueño mayorista u operador, sin embargo, debe ser certificado por la Comisión de Juegos.[58] De manera que esta pueda tener acceso a la información de dicho sistema, según lo requiera, y poder realizar las auditorias necesarias para certificar el funcionamiento de este.[59]

En mérito de lo anterior, se enmendó la Sección 8 de la Ley Núm. 11, para disponer que ninguna persona podría operar Máquinas de Juegos de Azar en Puerto Rico sin que cada una de dichas máquinas estuviese conectada a los Sistemas de Conexión Interna. En lo pertinente, se estableció "un periodo de transición para conectarse a dicho sistema, el cual será de un (1) año a partir del momento en que la Comisión de Juegos certifique a los proveedores de sistemas de interconexión y luego que los Dueños Mayoristas hayan escogido el sistema certificado a ser utilizado por estos".[60] Según se desprende de la Orden Administrativa OACJ-MR-25-02, no fue hasta el 14 de enero de 2026, cuando inició el periodo de interconexión.[61]

Por otro lado, se enmendó la Sección 10 para conceder "un plazo de ciento ochenta (180) días a aquellos dueños mayoristas con licencias de máquinas activas que al comenzar el periodo de transición según dispone esta Ley aún no tengan la totalidad de máquinas a las que tiene derecho, para que puedan pagar el balance

---

[57] Artículo 1 de la Ley Núm. 104-2022, 15 LPRA sec. 82.
[58] *Íd.*
[59] *Íd.*
[60] *Íd.* Artículo 3, 815 LPRA sec. 84d.
[61] Orden Administrativa de la Comisión de Juegos sobre el Comienzo de periodo de interconexión para Maquinas de Juego de Azar en ruta del 11 de diciembre de 2025. Véase SUMAC TPI, a la Entrada Núm. 6, Anejo 7.

de licencias restante".[62] De manera que, "[s]i al cabo de dicho periodo, algún mayorista no ha logrado pagar las licencias, adquirir y ubicar de forma funcional la cantidad total de máquinas, el Dueño Mayorista perderá el derecho a pagar las licencias remanentes y a ubicar las máquinas que hubieren correspondido a dichas licencias".[63] Siendo el máximo de máquinas de juegos de azar doscientos cincuenta (250), por cada dueño mayorista u operador, por grupo de entidades relacionadas.[64] Pasado el periodo de ciento ochenta días (180), la Comisión de Juegos "podrá emitir liberar dichas licencias para ser emitidas a Dueños Mayoristas adicionales hasta los máximos que permite esta Ley".[65] Siendo el máximo veinticinco mil (25,000) máquinas de juego de azar.[66]

Finalmente, mediante la Ley Núm. 42-2024, se enmendaron nuevamente las antes señaladas Secciones 8 y 10. Esta Ley se promulgó, entre otras cosas, a los fines de establecer el periodo en que los dueños mayoristas podrán pagar la totalidad de licencias de máquinas a las que tuvieran derecho. Respecto a este particular, se enmendó la Sección 10 para aumentar el término de ciento ochenta (180) días a dos (2) años, para que los dueños mayoristas obtuvieran la totalidad de las máquinas a las cuales tenían derecho.[67] Deponiéndose así que:

> [. . .].
>
> La Comisión concederá un plazo de dos (2) años a aquellos dueños mayoristas con licencias de máquinas activas que al comenzar el periodo de transición según dispone esta Ley aún no tengan la totalidad de máquinas a las que tiene derecho, para que puedan pagar el balance de licencias restante. Si al cabo de dicho periodo, algún mayorista no ha logrado pagar las licencias, adquirir y ubicar de forma funcional la cantidad total de máquinas, el Dueño Mayorista perderá el derecho a pagar licencias remanentes y a ubicar las máquinas que hubieran correspondido a dichas licencias.

---

[62] Artículo 4 de la Ley Núm. 104, *supra*, 815 LPRA sec. 84f.
[63] *Íd.*
[64] Véase, Sección 3 (9) de la Ley Núm. 11, *supra,* 15 LPRA sec. 82.
[65] Artículo 4 de la Ley Núm. 4, *supra*, 815 LPRA sec. 84f.
[66] Véase, Sección 6 de la Ley Núm. 11, *supra,* 15 LPRA sec. 84b.
[67] Artículo 3 de la Ley Núm. 42-2024, 815 LPRA sec. 84d.

La Comisión, entonces podrá emitir liberar dichas licencias para ser emitidas a Dueños Mayoristas adicionales hasta los máximos que permite esta Ley.

[. . .].[68]

Concluimos destacando que, en virtud de las enmiendas de la Ley Núm. 104-2022, las cuales mandaron la aprobación de un reglamento que estableciera el procedimiento para la otorgación de licencias establecidas en la Ley, se promulgó el Reglamento Núm. 9647. En lo pertinente al caso de marras, este cuerpo normativo dispone en su Sección 2.5 (G) lo siguiente,[69]:

La Comisión de Juegos solamente evaluará aquella Solicitud de Licencia completa y acompañada por toda la información requerida en este Reglamento, disponiéndose, que toda Solicitud incompleta que sea presentada a la Comisión de Juegos se entenderá como si no hubiera sido presentada. La Comisión, dentro de un término de quince (15) días a partir de concluir que la solicitud entregada está incompleta, le notificará al solicitante cuales son los incumplimientos específicos. Todo anejo deberá ser presentado en español o inglés, o en la alternativa, venir acompañado de una traducción certificada que incluya el nombre, fecha y firma de la persona que realizó la traducción.

III

En el recurso apelativo ante nuestra consideración, debemos resolver si la expedición de un auto de *mandamus* era el vehículo procesal correcto para disponer del caso tal y cual dictaminó la primera instancia judicial.

En síntesis, en el caso de marras, tal y cual reseñamos, la parte apelada peticionó un auto de *mandamus* ante el foro primario para compeler su deber ministerial de recibir, evaluar y notificar incumplimientos, si alguno, en lo relativo a sus solicitudes de licencias de dueños Mayoristas u operadores de máquinas de juegos de azar en ruta al amparo de la Ley Núm. 11 y el Reglamento Núm. 9647. Planteó que existía un deber ministerial claro e imperativo de determinar si una solicitud presentada estaba completa o

---

[68] Artículo 3 de la Ley Núm. 42-2024, *supra*, 815 LPRA sec. 84d.
[69] *Supra.*

incompleta en el término reglamentario y que, de acuerdo con la Ley Núm. 11, existía el deber ministerial de aceptar nuevas solicitudes de licencias hasta el máximo de veinticinco mil (25,000) máquinas. En apoyo a lo anterior, adujo haberse incoado el requerimiento previo exigido en las acciones sobre *mandamus*.

Por otro lado, la parte apelante razonó que no se justificaba la concesión de un remedio y que lo que procedía era la desestimación del auto de *mandamus*. En lo pertinente al asunto ante nos, fundamentó su posición en que, a su juicio, la Ley Núm. 11, no imponía un deber ministerial en estos momentos. Planteó que de acuerdo con la Sección 8 de la antedicha Ley,[70] la Comisión de Juegos disponía de un periodo de transición de un (1) año para conectarse a los sistemas de interconexión el cual, conforme a la Orden Administrativa OACJ-MR-25-02,[71] comenzó a decursar el 14 de enero de 2026, por tanto, no había culminado. Esbozó que, de acuerdo con la Sección 10 de la Ley Núm. 11,[72] quedaba establecido que solo después de culminado ese periodo de transición y, únicamente de no haberse otorgado licencias equivalentes veinticinco mil (25,000) máquinas autorizadas, era que la Comisión de Juegos podía aceptar nuevas solicitudes.

Además, la parte apelante acotó que, de acuerdo con la Sección 10 de la precitada Ley,[73] los dueños mayoristas tenían un plazo de dos (2) años a partir del comienzo del proceso de transición para que, si no tenían la totalidad de máquinas a las que tuviese derecho, pudiesen pagar el balance de licencias restante. A tenor, razonaron que en estos momentos no existía obligación legal alguna de aceptar nuevas solicitudes de licencia.

---

[70] 15 LPRA sec. 84d.
[71] Orden Administrativa de la Comisión de Juegos sobre el Comienzo de periodo de interconexión para Maquinas de Juego de Azar en ruta, *supra*. Véase SUMAC TPI, a la Entrada Núm. 6, Anejo 7.
[72] 15 LPRA sec. 84f.
[73] *Íd.*

El foro de instancia dispuso celebrar una vista para atender todos los asuntos pendientes en el caso. Destacamos que, en lo atinente, en ese punto, los asuntos pendientes eran tanto el pliego de la parte apelada para que se expidiera el auto de *mandamus*, como la solicitud de desestimación interpuesta por la parte apelante. Según se desprende de los autos, durante esa vista, las partes tuvieron oportunidad para exponer sus posiciones y planteamientos al Tribunal y el asunto quedó sometido. El resultado fue que la primera instancia judicial expidió el auto de *mandamus* y ordenó a la parte apelante a cumplir con las disposiciones de la Sección 2.5 (G) del Reglamento Núm. 9647, y la Sección 10 de la Ley Núm. 11,[74] en un término de cinco (5) días, con ciertos apercibimientos que ya hemos reseñado.

Tras haber quedado insatisfecha con lo dispuesto, la parte apelante compareció ante nos mediante un recurso de apelación.

En su *primer* señalamiento de error, planteó que el foro de instancia se equivocó al expedir el auto de *mandamus* sin que existiera un deber ministerial claro, específico e incondicional. Luego, en su *segundo* señalamiento de error, nos refiere que se cometió el error de haber emitido determinaciones de hecho sin haberse celebrado una vista evidenciaria; sin haberse recibido prueba testimonial ni documental, y sin que se hubiesen presentado estipulaciones de hechos; alegando que el foro *a quo* convirtió las alegaciones y los argumentos de los representantes legales en hechos adjudicados.

Por otro lado, en el *tercer* señalamiento de error, esgrime que fue un error el haber rechazado la defensa de falta de partes indispensables. Mientras que, en el *cuarto* y último señalamiento de error, planteó que incidió el tribunal *a quo* al conceder un remedio

---

[74] 15 LPRA sec. 84f.

*ultra vires* no contemplado por la Ley Núm. 11, ni por el Reglamento 9647, pues con su proceder, creó una prioridad y carácter preferente a favor de la parte apelada.

Hemos estudiado la totalidad de los autos ante nuestra consideración con detenimiento, incluyendo, pero sin limitar las posiciones de las partes y los errores esgrimidos, así como los autos ante el foro de instancia. Dicho lo anterior, llegamos a la conclusión de que, por el curso decisorio tomado, no es necesario elaborar una discusión en torno a la totalidad de los errores, sino que nos circunscribiremos a la cuestión sobre si el foro de instancia incidió al disponer expedir el auto privilegiado de *mandamus*, a lo que coincidimos que sí, incidió. Veamos.

Sabido es que el recurso de *mandamus* es uno altamente privilegiado en el cual se requiere el cumplimiento de algún acto que en el referido auto se exprese y esté dentro de las atribuciones o deberes.[75] El auto de *mandamus* no confiere nueva autoridad, sino que la parte obligada deberá tener facultad de poder cumplirlo.[76] De igual modo, el referido recurso sólo procede para exigir el cumplimiento de un deber impuesto por la ley. Es decir, un deber calificado de "ministerial" y que, como tal, no admita discreción en su ejercicio, sino que sea mandatorio e imperativo.[77]

De otra, precisa acentuar que para que se logre expedir un auto de *mandamus*, es necesario que exista la constancia de un deber claramente definido que deba ser ejecutado.[78] Además, por tratarse de un recurso altamente privilegiado, su expedición no se invoca como cuestión de derecho, sino que descansa en la sana discreción del tribunal.[79] Sin embargo, la procedencia del

---

[75] Artículo 649 del Código de Enjuiciamiento Civil, *supra*, 32 LPRA sec. 3421.
[76] *Íd.*
[77] *Kilómetro 0 v. Pesquera López et al.*, supra, a la pág. 21; *AMPR v. Srio. Educación, ELA*, supra, a la pág. 263.
[78] *AMPR v. Srio. Educación, ELA*, supra, a las págs. 263-264.
[79] *Íd.*, a la pág. 266.

*mandamus* depende inexorablemente del carácter del acto que se pretende compeler mediante dicho recurso.[80] En tal sentido, este recurso extraordinario "sólo procede para ordenar el cumplimiento de un deber ministerial, que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir ese remedio".[81]

En primer lugar, debemos destacar que la *Petición de mandamus* acompañó un documento con la finalidad de acreditar haber realizado un requerimiento previo tal y cual dispone nuestro marco doctrinal. Ahora bien, adentrándonos en el recurso ante nuestra consideración, es de ver que la parte apelante sostiene que no existe un deber ministerial que hubiese requerido la expedición del auto, puesto a que la solicitud no se había presentado en el espacio temporal correcto, según dispone la Ley Núm. 11, independientemente de lo que dispone el Reglamento 9647. En otras palabras, en estos momentos, no había ningún deber ministerial incumplido.

Según hemos reseñado, si bien es cierto que el Reglamento 9647, dispone para la aceptación de nuevas solicitudes de licencia y los pasos a seguir una vez se presentan, dicho Reglamento no opera en el vacío. El Reglamento tiene la función de establecer los procedimientos para otorgar las licencias establecidas en la Ley Núm. 11. Quiérase decir, que el Reglamento opera en virtud de la antedicha Ley.

Según surge de nuestra previa exposición doctrinal, desde su creación, la Ley Núm. 11 ha sufrido diversos cambios, incluyendo que, allá para el año 2018, se añadió la Sección 8 y la Sección 10, las cuales hoy son objeto de estudio. Recordemos además que, luego

---

[80] *Acevedo Vilá v. Aponte Hernández*, supra, a la pág. 455.
[81] *Aponte Rosario et al. v. Pres. CEE II*, supra, a las págs. 427-428*; Acevedo Vilá v. Aponte Hernández,* supra*,* a las págs. 454-455.

de que dichas secciones fueron añadidas a la Ley Núm. 11, las mismas sufrieron enmiendas tanto en el año 2022,[82] como en el año 2024.[83]

Conviene en este punto mencionar que, si bien es cierto que la Comisión de Juegos fue objeto de un *Examen sobre los procesos de solicitud, otorgación, denegación y revocación de licencias para Dueños Mayoristas u Operadores y Dueños de Negocios de Máquinas de Juegos de Azar en Ruta*, realizado por la Oficina del Inspector General, suscrito el 3 de noviembre de 2023, bajo el número OIG-E-24-006,[84] también es claro que, como hemos reseñado, hubo enmiendas posteriores, a la Ley Núm. 11.

Abona a lo anterior que, conforme a la Sección 8 de la Ley Núm. 11, la Comisión de Juegos tiene la potestad de establecer los requisitos técnicos, las solicitudes y las certificaciones de los proveedores de sistemas de interconexión interna de los Operadores o dueños mayoristas.[85] A tenor, mediante la Orden Administrativa OACJ-MR-24-11, se aprobó el estándar técnico para máquinas de juegos de azar en ruta.[86] Surge de la referida Orden Administrativa, en lo pertinente, que Gaming Laboratories International LLC, que es un laboratorio independiente autorizado por la Comisión de Juegos, certificó siete (7) proveedores de sistemas de interconexión. Entonces, de acuerdo con la Orden Administrativa OACJ-MR-25-02, se dispuso que **el periodo de interconexión comenzaría el miércoles, 14 de enero de 2026**.[87]

Abona a lo anterior que, la Sección 10 de la Ley Núm. 11 dispone que el periodo de transición sería de un (1) año, término en

---

[82] Ley Núm. 104-2022, *supra.*
[83] Ley Núm. 42-2024, *supra*
[84] SUMAC TPI, a la Entrada Núm. 1, Anejo 1.
[85] 15 LPRA sec. 84d.
[86] Orden Administrativa de la Comisión de Juegos sobre Autorización de Estándar Técnico y de Interconexión para Maquinas de Juegos de Azar del 21 de junio de 2024. Véase SUMAC TPI, a la Entrada Núm. 6, Anejo 6.
[87] Orden Administrativa de la Comisión de Juegos sobre el Comienzo de periodo de interconexión para Maquinas de Juego de Azar en ruta, *supra.* Véase SUMAC TPI, a la Entrada Núm. 6, Anejo 7.

el cual los Dueños Mayoristas u Operadores adquirieran e instalaran un sistema de conexión interno.

Con todo lo anterior en mente, nos dimos a la tarea de examinar, entre otros detalles, el historial de la Sección 10 de la Ley Núm. 11.[88] Allí, como parte de los cambios sufridos, en el año 2024, la referida Sección fue enmendada para establecer el periodo en que los dueños mayoristas podrían pagar la totalidad de licencias de máquinas a las que tuviesen derecho.

Por lo tanto, aun cuando tiene razón la parte apelada en que el Reglamento Núm. 9647 dispone para el recibo y evaluación de solicitudes, lo cierto es que no podemos evaluarlo tal y cual fuese un asunto aislado e inmediato. Tal interpretación no puede ser abstraída de una realidad y es que el periodo de interconexión comenzó el 14 de enero de 2026. Por tanto, no ha decursado ni el año para la interconexión, mucho menos el de dos (2) años que dispone la Sección 10 de la Ley Núm. 11, para que la Comisión de Juegos pueda liberar las licencias para ser emitidas a dueños mayoristas adicionales hasta los máximos que permite la referida Ley.

Dicho lo anterior, concluimos que, conforme a la doctrina y marco jurídico antes expuesto, al menos en estos momentos, no existe un deber ministerial claramente definido que hubiese requerido la expedición del auto de *mandamus,* por lo que concluimos que incidió el foro de instancia y procede la revocación de la *Sentencia* apelada. En consecuencia, se desestima de la *Petición de mandamus.*

IV

Por los fundamentos que anteceden, se *revoca* la *Sentencia apelada.* En consecuencia, se *desestima* la *Petición de mandamus.*

---

[88] 15 LPRA sec. 84d.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. El juez Bonilla Ortiz disiente de la *Sentencia* que precede por entender que mientras exista cupo para otorgar nuevas licencias para Máquinas de Juegos de Azar, la Comisión tiene el deber ministerial de recibir y procesar nuevas solicitudes de licencias para los peticionarios y cualquier otra parte interesada en estas licencias. No está en controversia que hay espacio para otorgar licencia a 2,000 nuevas máquinas. El término de un año de la sección 8 y el de dos años de la sección 10, en nada limitan el cupo existente de 2,000 máquinas disponible para nuevas licencias.

Lcda.　Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones